| | |
|---|---|
| 1    **LUJAN AGUIGUI & PEREZ** LLP<br>     Attorneys at Law<br>2    DNA Building, Suite 300<br>     238 Archbishop Flores Street<br>3    Hagåtña, Guam 96910<br>     Telephone (671) 477-8064/5<br>4    Facsimile (671) 477-5297 | <br>**FILED**<br>DISTRICT COURT OF GUAM<br><br>APR 1 8 2008<br><br>JEANNE G. QUINATA<br>Clerk of Court |

*Attorneys for Defendant In Hyuk Kim aka Dominic*

## IN THE UNITED STATES DISTRICT COURT
## TERRITORY OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>vs.<br><br>IN HYUK KIM aka DOMINIC,<br><br>Defendant. | CRIMINAL CASE NO. CR07-00064<br><br>**MOTION TO SUPPRESS** |

### INTRODUCTION

Defendant, IN HYUK KIM, by and through counsel, LUJAN AGUIGUI & PEREZ LLP, moves to suppress oral and written statements allegedly provided by him to law enforcement after his arrest on July 31, 2007. These statements are contained in the Report of Investigation, Arrest and Interview of In Hyuk Kim, dated August 8, 2007 and the "Affidavit" of Kim dated July 31, 2007, which are attached herewith as **Exhibit A and B** respectively. The alleged statements constitute inadmissible Rule 11 proffer statements and must be suppressed from the trial of this matter.

### FACTS

Law enforcement agents obtained a warrant to arrest Kim. On July 31, 2007 at approximately 5:00 a.m. law enforcement officers approached Kim at the airport employee parking lot. Their intention was to arrest Kim but to keep his arrest secret. Their hope was to obtain Kim's cooperation. Toward this end, agents had extensive discussions with Kim about Kim

cooperating in exchange for possible assistance consideration. The agents had advised the Assistant United States Attorney when they arrested Kim. Law enforcement, acting as agents of the Office of the United States Attorney, discussed resolution of Kim's case, although a plea of guilty had never been entered. In the scope of these discussions, Kim allegedly provided oral and written statements to the agents, which statements continued after Kim's attorney arrived.

Months later, on February 11, 2008, at the motions hearing, the Assistant United States Attorney discussed the applicability of Rule 11 in connection with statements made by Kim. Also at that hearing, law enforcement agents testified.

Agent John Duenas testified as follows, *inter alia*:

1. "We hoped to gain [Kim's] cooperation to identify this Customs and Border Patrol inspector that he alleges he has connections with, and to also try to identify other bar owners or other individuals that are here in the U.S. illegally. (39:11-15).
2. Duenas had notified the U.S. Attorney's office that Kim had been arrested. (44:21-23).
3. Law enforcement tried to keep the arrest quiet. (111: 21-24).
4. Law enforcement hoped to gain Kim's cooperation. (111:25-112:2).
5. "...there's things in place that we could do that would assist you and assist us should you decide to cooperate, and by one is either sealing a case and nobody needs to know about what's going on..." (112:25-113:4).
6. "I explained to Mr. Kim my experiences with other defendants, I told him that I've seen worse case scenarios that people go to jail for five, ten years, and I've seen instances where people actually get probation; I said it all depends on your cooperation." (114:13-17).
7. The way he explained it to Mr. Kim, if he cooperates, then his chances of going to jail are less. (114:18-21).
8. That was the message Duenas was trying to convey to Kim. (114:22-24).
9. Duenas was asked: "And you indicated earlier that it was your intention to convey to him the idea that if he cooperated, that he'd be exposed to a lower sentence; right?" (123:7-10).
10. Duenas replied: "Well, that wasn't - - I was giving him examples, and then that was conveyed to Mr. Gorman that, hey, we thinks this guy's got good information, this is what we think he's got, we'd like his cooperation." (123:11-16).

2

USA vs. In Hyuk Kim aka Dominic; CR07-00064
Motion to Suppress

Case 1:07-cr-00064   Document 71   Filed 04/18/2008   Page 2 of 15

11. Representations were made that Kim's arrest would be kept secret. (133: 17-19).

12. "I gave [Kim] scenarios where I was actually involved in cases where I've seen worse case scenarios where people have gone to jail, five to ten years, and I've seen people who actually away from things, and it depends on how much you cooperate and what kind of information you have. And to – to further substantiate his, his – this scheme, if you will, or – I called up Mr. Gorman and notified him of the arrest and come down because Mr. Kim was willing to cooperate with us, but was worried about going to jail." (134:2-14).

13. "...Mr. Kim wanted to cooperate with us, and I felt that in order to make him feel more confidence, confident about what he was doing was to bring an attorney on board and let him talk to Mr. Gorman." (139: 16-20).

14. "I testified that [Kim] wanted to cooperate, I summoned Mr. Gorman, and after he spoke with Mr. Gorman he continued to cooperate with us." (142:8-11).

15. After Kim made his written statement Kim provided additional cooperation. (143).

16. "We continued to talk to [Kim], and he continued to provide information about his, his scheme or involvement with this I-94." (143:8-12).

The Assistant United States Attorney, acknowledging the applicability of Rule 11, and the inadmissibility of statements made thereunder by Kim, told the Court:

> Apparently I'm told that after Mr. Gorman was representing [Kim], he had him interviewed by the agents to see if he could get him substantial assistance. As I told counsel, that would be under Rule 11, and would be considered a Rule 11 proffer, but that could not be used for any reason. (156:2-7).

Agent Richard Flores testified as follows, *inter alia*:

1. Flores remembered Duenas giving examples of Duenas's experiences with people who had these types of cases where some may do ten years and some may do no time. (169:14-22).

2. Flores agreed that Kim had been arrested at 5:00 a.m. in an effort to keep his arrest secret. (169:23-170:1, 171:25-172:2).

3. Flores acknowledged that the hope was that agents would gain the cooperation of Kim. (170:2-4).

4. Kim cooperated. (172:7).

5. When agents were talking with Kim they were trying to gain his cooperation. (173:13-16).

6. The idea was to convey to Kim the message that if he cooperated things will be better. (174:1-3).

## ARGUMENT

Federal Rule of Criminal Procedure, Rule 11(f) provides, "The admissibility or inadmissibility of a plea, a plea discussion, and any related statement is governed by Federal Rule of Evidence 410." Federal Rule of Evidence, Rule 410 provides:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the defendant who made the plea or was a participant in the plea discussions:

(1) a plea of guilty which is later withdrawn;

(2) a plea of nolo contendere;

(3) any statement made in the course of any proceedings under Rule 11 of the Federal Rules of Criminal Procedure or comparable state procedure regarding either the foregoing pleas; or

(4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn.

Statements made by a defendant during plea negotiations, including proffer sessions, are inadmissible at trial. *United States v. Velez*, 354 F.3d 190, 194 (C.A.2 N.Y., 2004). In the instant case, the oral and written statements provided by Kim on July 31, 2007, were cooperation proffers, made toward negotiation of a resolution of Kim's case, and are therefore inadmissible at trial.

/

/

/

/

/

4

*USA vs. In Hyuk Kim aka Dominic*; CR07-00064
Motion to Suppress

Case 1:07-cr-00064   Document 71   Filed 04/18/2008   Page 4 of 15

## CONCLUSION

The oral and written statements allegedly made by Kim on July 31, 2007 were cooperation proffers, made toward the negotiation of a resolution of Kim's case, and are therefore inadmissible at trial and must be suppressed.

Dated this 18th day of April, 2008.

LUJAN AGUIGUI & PEREZ LLP

By: /s/ Peter C. Perez
PETER C. PEREZ, ESQ.
*Attorneys for Defendant In Hyuk Kim aka Dominic*

K-0021/878-00/0878/PCP/dmg

5

*USA vs. In Hyuk Kim aka Dominic*; CR07-00064
Motion to Suppress

Case 1:07-cr-00064   Document 71   Filed 04/18/2008   Page 5 of 15

# EXHIBIT A

| DEPARTMENT OF HOMELAND SECURITY ICE | TECS ACCESS CODE 3 |
|---|---|
| REPORT OF INVESTIGATION | PAGE 1 |
| | CASE NUMBER GM16CR06GM0005 |

| TITLE: IN HYUK KIM |
|---|

| CASE STATUS: | INTERIM RPT |
|---|---|

| REPORT DATE 080807 | DATE ASSIGNED 022106 | PROGRAM CODE 2G2 | REPORT NO. 005 |
|---|---|---|---|

RELATED CASE NUMBERS:

COLLATERAL REQ:

TYPE OF REPORT:
INVESTIGATIVE FINDINGS

TOPIC: ARREST AND INTERVIEW OF IN HYUK KIM

SYNOPSIS:

In Hyuk KIM and Mi Kyung BOSLEY are involved in a scheme to falsify the departure from Guam of Korean nationals who enter Guam under the Guam Visa Waiver program and then overstay their authorized 15 days in Guam in order to work at various nightclubs and karaoke bars. KIM, a Korean Airline employee collects the I-94 cards and submits them to CBP for entry into the Non-Immigrant Information System database when in fact the Korean nationals remain in Guam as overstays. On July 25, 2007, In Hyuk KIM and Mi Kyung BOSLEY were indicted by a federal grand jury in Guam for conspiracy to commit Alien Smuggling in violation of 8USC1324 and 18USC371.

On July 31, 2007 RAC/Guam Agents arrested In Hyuk KIM pursuant to a warrant of arrest issued by the District Court of Guam. In Hyuk KIM cooperated in the investigation and admitted to using his position as an airline employee to falsifying the departure of Korean nationals from Guam. Details of KIM's post arrest interview are provided in this report.

| DISTRIBUTION: RACGM SACHL CAKO | SIGNATURE: FLORES | RICHARD | N | SPECIAL AGENT |
|---|---|---|---|---|
| | APPROVED: ROBERTSON | ROBERT | D | RAC-RESIDENT AGENT IN |
| | ORIGIN OFFICE: GM GUAM - RAC | TELEPHONE: 0 0 0 | | |
| | | TYPIST: FLORES | | |

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 2 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER GM16CR06GM0005 |
| | REPORT NUMBER: 005 |

CASE PROGRAM CODES:

2G2 CUC OP PACIFIC RAINB   6D1 ALIEN FRAUD SCHEMES

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 3 |
|---|---|
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER GM16CR06GM0005 |
| | REPORT NUMBER: 005 |

1. On July 25, 2007 In Hyuk KIM aka "Dominic" and Mi Kyung BOSLEY were indicted by a federal grand jury in the District of Guam for Conspiracy to Commit Alien Smuggling, a violation of 8USC1324, 18USC371 and 18USC2. Arrest warrants were issued.

2. On July 31, 2007 at about 5:10 a.m., with the assistance of Guam Customs and Quarantine Agency personnel, KIM was arrested in the employee parking lot of the Guam International Airport as he was getting off from work. Special Agent (SA) Richard Flores along with Task Force Agent (TFA) Erwin Fejeran served KIM a copy of the warrant of arrest and indictment. SA Flores informed KIM that he was being arrested pursuant to the warrant and that he was being transported to the RAC/Guam office for processing.

3. At about 5:30 a.m., SA Flores advised In Hyuk KIM of his constitutional rights at the RAC/Guam office, as witnessed by SA John Duenas. KIM acknowledged, signed and waived his rights and agreed to cooperate with the investigation. KIM provided the following statements to SA Flores and SA Duenas:

    A. KIM, a naturalized U.S. citizen and long time resident of Guam, began his employment with Korean Air in 2003 as a passenger service agent.

    B. KIM stated that he was first asked by Won Bae SUH, the owner of Club Volvo, to submit an I-94 Departure Record for one of his Korean female employees to Customs and Border Protection (CBP) to make it appear the Korean female had left prior to the expiration of her authorized stay under the Guam Tourist (GT) Visa Waiver Program. KIM explained that he does not remember the female's name and that he only recalls her as being an employee of SUH.

    C. KIM received a copy of the female's passport and her original I-94 from SUH and then turned in to CBP the I-94 along with other I-94 Departure Records of legitimate departing passengers of Korean Air flights. This would then allow for the employee to remain on Guam past the authorized fifteen days undetected as a Guam Visa Waiver Violator or GT overstay.

    D. KIM claimed that initially he received free drinks from SUH's Club in exchange for his service.

    E. KIM explained that when the GT overstay wished to return to Korea he would change some of the information such as the date of birth of the departing passenger in the Korean Air computer system to reflect on the flight passenger manifest and not reflect information of the individual's original I-94 that KIM submitted to CBP officials.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

| | |
|---|---|
| DEPARTMENT OF HOMELAND SECURITY ICE | PAGE 4 |
| REPORT OF INVESTIGATION CONTINUATION | CASE NUMBER GM16CR06GM0005 |
| | REPORT NUMBER: 005 |

OFFICIAL USE ONLY

F. KIM continued to assist SUH with I-94s for approximately a year and was eventually paid $300.00 to $400.00 per I-94 Departure Record that he submitted to CBP. KIM claims to have assisted SUH with approximately ten I-94s within one year. KIM stated that he knew the scheme of submitting I-94s to CBP was illegal.

G. Won Bae SUH eventually told other Korean Bar owners of KIM's ability to falsify the departure of Guam Visa Waiver visitors which prompted others to seek KIM's assistance. KIM explained that he was approached by the owners of Big Mama Lounge, located in the Royal Orchid Hotel in Tumon, Guam. KIM was only able to identify the owners as Yuji and Aena, both Korean female. KIM claimed to have submitted approximately five I-94s between the years 2004 and 2005. He claimed to have received $300.00 per document.

H. KIM then explained that he met Ms. Noh, owner of Club Yeobo, by introduction from the owners of Big Mama Lounge. He explained that he received and sent out approximately five I-94s for Ms. Noh at Club Yeobo and charged her approximately $400.00 for each document.

I. He also met a Korean female named Yi Jie who was the owner of Apple Lounge through Ms. Noh. KIM said that he received nine I-94s from Yi Jie. KIM recalled that he received about five I-94s in the beginning of 2006 and approximately four more in late 2006. In late 2006, he recalled that he was only paid for three of the four I-94s that were given to him.

J. KIM also explained that during the year 2006 he heard rumors of an investigation at the airport, which lead him to discard the I-94s he received as opposed to turning them into CBP. He stated that he still continued to assist in the departure of the GT overstays by changing their passenger information as they checked in for their Korean Air flights back to Korea.

K. KIM further described how he would receive phone calls at work from people he knew who would ask if certain female passengers posing as Guam Visa Waiver Tourists had passed through immigration inspection. He explained that he would only inform the callers if the passengers were in CBP secondary inspection.

L. KIM concluded the interview and provided a written statement in regards to this investigation to SA Richard Flores as witnessed by SA John Uenas.

. On July 31, 2007 at about 10:30 a.m., In Hyuk KIM appeared in the District Court of Guam for his initial appearance. KIM was released on his own recognizance pending trial scheduled for September 24, 2007.

OFFICIAL USE ONLY
THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

```
                           4 RECORDS ARE RELATED TO BASE RECORD
GM16CR06GM0005005      ROI   CGM FLORES              R 080807


P4932610000CGM          AN                YE JU          A F 110979
      SA   SUSPECT, ALIEN                                            SUB-SOURCE

P9G74953200CGM          BOSLEY            MI KYUNG       A F 080776
      SC   SUBJECT OF CURRENT INVESTIGATION                          SUB-SOURCE

P9G74992300CGM          KIM               IN HYUK        D A M 020182
      SC   SUBJECT OF CURRENT INVESTIGATION                          SUB-SOURCE

GM16CR06GM0005          CASE CGM FLORES                 R 022106
      IN HYUK KIM
```

# EXHIBIT B

# DEPARTMENT OF THE TREASURY
## UNITED STATES CUSTOMS SERVICE

## AFFIDAVIT

STATE OF: _____ )

COUNTY OF: _____ )

I, In Hyuk Dominic Kim

Who after being duly sworn states the following:

I first started sending I-94 that was given to me by Suh/Wonbae. This happenned back in 2003. I had recieved from him was $400 and to drink at the Club he owned Club Volvo. I do not recall how many I sent out, but it was around 10. Suh/Wonbae informed other owner such as Yuji and Aena who owned Big mama. I probably sent arround 4 I-94 per their request and recieved $300 per person. I then met Ms. Noh who was close with Aena of Big Mama. Ms Noh later worked at Yeobo Club where I sent 5 I-94 as she requested and recieved $300 per person. I recieved I-94 from YiJae as request by Ms. Noh. I am thinking I recieved around 4 in early 2006 and 5 additional late 2006. I was told 4 was for the request of Park/KwangHo and was paid $1200 for all 4 people and didn't get the other 400 as promised. My last I-94 I sent was early 2007 or late

The contents of this statement are true and correct to the best of my knowledge and belief.

Subscribed and sworn to before me this 31 day of July , in the year 2007

_____ Special Agent

_____ Affiant

_____ Witness

## AFFIDAVIT (continuation)

2006. After the first two or three years of send I-94 illegally, I heard rumors of investigation. I stopped sending I-94 but still recieved money to send the I-94, I just threw the I-94 away and made it seem the I-94 was sent. Because I work at the airport, people will call me to get information about someone being in secondary or If some came to Guam. In no way did I know that some one was coming unless they were not released by CBP and the manager or owners will call me about a certain passenger. In no way did I falsify in the interpretation conducted. I may know or assume their intent was for working but I am there to interpret the best I can. I recieved phone calls from Mr. Choi Byoungkuk asking me about Mr. Kim/Douglas. I asked him how he knew Mr. Douglas Kim and how he is associated with him. All he told me was that someone else was asking. I told him he was held by customs I met Mr. Choi/Byoung Kuk when he came to Guam for his honey moon. I was asked by Mr.Kim/ Yong Sik to drive them around. It was Mr. Yong Sik through Yuji of Big MaMa to drive and guide Mr. SaYong Kim when he came to Guam for his Honey Moon. In no way was I connected with drugs being brought in to Guam

The contents of this statement are true and correct to the best of my knowledge and belief.

Subscribed and sworn to before me this 31 day of July, in the year 2007.

_____ Affiant

_____ Special Agent

_____ Witness

Page 2 of 3

Customs Form 4604C (062697)

## AFFIDAVIT (continuation)

I had ~~droppe~~ It Met Mr. Kim/YongSik before he left guam. I had picked him up at M&M spa and went to Yong Sanma Club before I dropped him at the airport. He showed me his green card and also informed me that I wouldn't be able to reach him until he takes care of some business with police. He said he would be arrested as soon as he arrives in Korea. This was the last I heard from him. It was later that I was told that he was involved in smuggling drugs. I only found out through Mr. Kim/SaYong because he was asking to find out what had happen to Mr. Kim/DooHwan. Mr. Sayong told me that Mr. DooHwan was involved in smuggling drugs this was a month after the drug smuggling Incident. I had to go to the consulate and find out his whereabouts. The only money I recieved from Mr. Sa Yong Kim was not for me but to buy books for Mr. Dohwan Kim. I had dropped off books at agana Precint.

The contents of this statement are true and correct to the best of my knowledge and belief.

Subscribed and sworn to before met this 31 day of July, in the year 2007.

_____ Affiant

_____ Special Agent

_____ Witness

Page 3 of 3